## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 09-21178-Civ-MORENO/TORRES

MIGUEL J. LARACH, an individual, and
GREAT AMERICAN CORPORATION, a
foreign corporation,

    Plaintiffs,

v.

STANDARD CHARTERED BANK
INTERNATIONAL (AMERICAS)
LIMITED, a Massachusetts corporation,
STANCHART SECURITIES
INTERNATIONAL, INC., a Florida
corporation,

    Defendants.

_____/

## REPORT AND RECOMMENDATION
## ON COUNTER-PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNTS IV AND V OF THE COUNTERCLAIM AND DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS II – VIII OF THE SECOND AMENDED COMPLAINT

This matter is before the court on Counter-Plaintiff Standard Chartered Bank International (Americas), Ltd.'s Motion for Summary Judgment on Counts IV and V of the Counterclaim [D.E. 59] and Defendants Standard Chartered Bank International (Americas), Ltd. and Stanchart Securities International, Inc.'s Partial Motion for Summary Judgment on Counts II through VIII of the Second Amended Complaint [D.E. 18] ("Motion"). [D.E. 85].  Counter-Defendant Great American Corporation and Plaintiffs Miguel J. Larach and Great American Corporation filed a Response [D.E. 93] and Defendants filed a Reply thereto. [D.E. 106].

The Parties each filed their respective Local Rule 7.5 Statement of Undisputed Facts, respectively [D.E. 86, 94].  On May 12, 2011, we struck Plaintiffs' Local Rule 7.5 Statement of Undisputed Facts for violating S.D. Fla. L.R. 7.5(c).  [D.E. 110].  Thereafter, Plaintiffs filed an Amended Statement of Undisputed Facts. [D.E. 112].  However, Plaintiffs' Amended Statement still violates this Local Rule.  Therefore, we shall accept Defendants' Statement as admitted because Plaintiffs fail to otherwise controvert the facts set forth therein.[1]

The Court has reviewed the motions, responses, replies, relevant authorities, supplemental filings and the record evidence submitted in support for or in opposition to the motions.  Based on a thorough review of the record, we find there are no genuine issues of material fact to preclude Defendants' Motion.  For the following reasons, we recommend **GRANTING** Defendants' Summary Judgment Motion because it relates *solely* to Defendants' loans to Inlaza S. De R.L. de C.V ("Inlaza") secured by Plaintiffs' general pledge agreement.

---

[1] Plaintiffs' Amended Statement starts with paragraph 24 which directly corresponds with where Defendants' Statement ends at paragraph 23.  Put differently, the Amended Statement includes only new facts *rather* than responding to Defendants' Statement by starting with paragraph one and either admitting or controverting that and each subsequent paragraph with evidence. [D.E. 112].  As a result, and pursuant to S.D. Fla. L.R. 7.5(d), Defendants' Statement of Undisputed Facts is "deemed admitted" as we find Defendants' statement is supported by evidence in the record. *See Gossard v. JP Morgan Chase & Co.,* 612 F. Supp. 2d 1242, 1245-46 (S.D. Fla. 2009) (citing *Digioia V. H. Koch & Sons*, 944 F.2d 809, 811 n. 6 (11th Cir. 1991) (upholding operation of former Local Rule 10.J.2, the predecessor of 7.5(d)).

# I.  BACKGROUND

This fraud dispute arises out of a banking relationship between Miguel Larach ("M. Larach") and Great American Corporation ("GAC") (collectively "Plaintiffs") and Standard Chartered Bank International (Americas), Limited ("SCBI") and Stanchart Securities International, Inc. ("Stanchart") (collectively "Defendants" or "Banks").

Generally, Plaintiffs initiated this action to recovery damages for purported fraudulent misconduct committed by the Defendants for their 1) unauthorized use of certain pledge agreements executed in blank to secure loans *other* than the loans for which the agreements were intended; and 2) later, for improperly freezing and seizing GAC's account assets to recover the unpaid loans purportedly secured with Plaintiffs' unauthorized pledge agreements.  Plaintiffs' fraud theory is broad, spans the entire banking relationship and identifies two sets of fraudulent loans.  However, as explained below, Defendants' Motion relates only to the Inlaza loans and, therefore, this Report is confined to those relative facts.  The following basic facts and events are undisputed.

M. Larach is the CEO, President and sole shareholder of GAC, a foreign private investment company. Also, M. Larach is a wealthy Honduran business man who successfully ran a manufacturing company in Honduras for thirty-five years.  During his career, M. Larach negotiated sales contracts with suppliers to purchase raw materials and, when necessary, secured lines of credits from banks to finance those purchases.  M. Larach personally handled negotiations with the banks to determine the commissions that the banks would charge.  While mostly wound down today, at its

3

height, M. Larach's company staffed over 100 employees.  Hence, M. Larach is an experienced businessman.

His association with Defendants began with William Solorzano ("Solorzano"), a Relationship Manager with the Banks.[2]  These two met in 1998 while Solorzano worked for SCBI's predecessor entity American Express Bank International ("AEBI").[3]  In 1999, M. Larach agreed to invest with Solorzano and opened two investment accounts maintained by AEBI under Solorzano's supervision.  These accounts were initially in M. Larach's name, but were later transferred into a corporate structure under the name Danimar Investments ("Danimar"). [D.E. 114, M. Larach Declaration ("M. Larach Decl."). at ¶ 5].

In July 2006, M. Larach consolidated these accounts by transferring them into GAC's newly opened account. [D.E. 86 at ¶ 4].  In connection with opening this account, M. Larach executed the Account Application and Agreement ("Account Agreement") and the Nondiscretionary Investment Services Agreement ("NISA"). [D.E. 86 at ¶ 7].  These documents, along with the Rules and Regulations Governing Accounts ("Account

_____

[2] SCBI and Stanchart are subsidiaries of Standard Chartered Bank. [D.E. 18 at ¶ 9-10].  Solorzano maintains that his employer was SCBI. [D.E. 114-9, Solorzano Deposition at p. 30:1 – 31:25]. This is undisputed by Plaintiffs.  However, Plaintiffs also name Stanchart as a party because, at a minimum, Solorzano's Series 7 license was held by Stanchart during his SCBI employment. Id. at p. 29:18-25.

[3] AEBI later changed its name to SCBI and, therefore, SCBI may enforce the rights of AEBI as a matter of law.  *See Stewart v. Preston*, 86 So. 348, 349 (Fla. 1920) (holding that "[t]he change in the name of a corporation has no effect upon its property, rights, or liabilities.  The corporation continues as before, and has the rights to sue on contacts made to it before the change.") AEBI is used herein when appropriate for time line accuracy, however, SCBI is the party-defendant, not AEBI.

Rules and Regulations"), govern the GAC account (collectively "GAC Account Documents"). [D.E. 86 at ¶¶ 5-6]. Solorzano remained M. Larach's Relationship Manager and primary contact with the Defendants until late 2008 when M. Larach terminated this relationship. M. Larach Decl. at ¶¶ 13, 31.

Defendants issued two sets of loans which are the subject of this litigation. While the first loan is noteworthy for continuity, only the second set of loans is explicitly relevant to Defendants' Motion. The first set of loans occurred between 2002 and 2006 when AEBI loaned Distribuidora RF5 S. De R.L. ("RF5") approximately $1.85 Million dollars. Notably, RF5 is a company owned by M. Larach's son Ruben Larach and which also held an account with Defendants. M. Larach, on behalf of Danimar, allegedly executed one, if not more, general pledge agreements to secure the RF5 loans (this is disputed by the Parties).

The second set of loans occurred between February 2007 and July 2008 when AEBI loaned Inlaza approximately $2.2 Million. Also notably, Inlaza is a company owned and operated by M. Larach's son Oscar Larach which also held an account with Defendants. M. Larach approached Solorzano and AEBI to secure an initial loan of $1.5 Million for Inlaza. Specifically, M. Larach sought to loan Oscar Larach money, but he did not want to give his son the loan directly. Instead, M. Larach sought to loan Inlaza this money *through the Bank* "[t]o make [Oscar Larach] responsible before a bank. It's not the same thing for Daddy to lend it to him than [it is for] a bank lending the money to him." [D.E. 114-1, M. Larach Dep. pp. 102:23 – 103:2]. To facilitate this loan, M. Larach deposited an additional $1.5 Million into GAC's AEBI account. On

5

February 16, 2007, Inlaza executed and delivered a Master Note ("Inlaza Note") in favor of AEBI in the principal amount of $1.5 Million, plus interest.  In turn, AEBI funded this $1.5 Million loan to Inlaza.

On February 16, 2007 (by fax) and March 19, 2008 (in person), M. Larach executed a general pledge agreement securing repayment of the Inlaza loan with the assets held in GAC's account (collectively the "Inlaza Pledge").[4]  The Inlaza Pledge is a short, two-page document clearly designating Inlaza as the "Borrower" and GAC as the "Pledgor."  On July 30, 2008, M. Larach acknowledged an additional loan of $200,000.00 to cover Inlaza's account overdraft. M. Larach Decl. at ¶ 29.

On February 18, 2009, after M. Larach terminated his relationship with Solorzano, Defendants provided correspondence to M. Larach that outlined Plaintiffs' indebtedness to the Banks and made a formal demand for the: 1) amounts outstanding relating to RF5 for loans and/or extensions of credit in the amounts of $1,074,333.97, $285,000.00, $300,000.00 and $200,000.00 – totaling $1,859,336.97; and, 2) amounts outstanding relating to Inlaza for loans and/or extensions of credit in the amounts of $541,158.49, $1,500,000.00 and $150,000.00 - totaling $2,191,158.49. M. Larach Decl. at ¶ 35.

Thereafter, the Banks froze and seized GAC's account assets. [D.E. 86 at ¶ 22]. To date, Inlaza has not repaid the full balance of its loans.  According to Defendants,

---

[4] In response to this question: "[w]hat reason, if any, did Mr. Solarzano give you for requiring that you, your company, pledge its assets to secure a loan to [Inlaza]?" M. Larach responded, "[t]hat I had to sign, as a requirement – that there was a requirement to sign a pledge for them to do that transaction." *Id.* at 41:15-20.

the total outstanding amount of the Inlaza loans, as of September 1, 2010, is $1,910,071.56. [D.E. 59 at ¶ 100]. This amount remains unpaid. [D.E. 86 at ¶¶ 19, 21].

Plaintiffs initiated this matter in May 2009 and subsequently filed a Second Amended Complaint in September 2009. [D.E. 18].  The seven-count Second Amended Complaint seeks redress for: 2) Violations of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501 *et seq*.; 3) Breach of Contract; 4) Breach of Duty of Good Faith and Fair Dealings; 5) Conversion; 6) Common Law Fraud; 7) Breach of Fiduciary Duties; and, 8) Negligence/Negligence Servicing.[5]

Defendants answered this complaint on September 1, 2010. [D.E. 59].  The answer included a counterclaim against GAC and a third-party claim against RF5 and Inlaza. *Id*.  The counterclaim asserts six actions against GAC, two of which are relevant here: 1) Count IV for damages arising under the Inlaza Pledge; and, 2) Count V for damages arising under the GAC Account Documents.  GAC denied the allegations of the Counterclaim and asserted SCBI's fraud as an affirmative defense.

While Plaintiffs allege fraud, Defendants' Motion is strictly based in contract. It argues that M. Larach knowingly and voluntarily executed the GAC Account Documents and the Inlaza Pledge securing repayment of the underlying loans to Inlaza.  Defendants assert these agreements are valid and enforceable and that now, as a result of default, Plaintiffs are liable under contract for the outstanding monies.

---

[5] The Court dismissed Count I. [D.E. 42].

7

As to Counts IV and V, Defendants assert that M. Larach executed the Inlaza Pledge to secure the credit obligations of Inlaza and that this evinces a valid and enforceable written contract between GAC and SCBI. Inlaza has defaulted. Therefore, SCBI maintains GAC is obligated to repay the Inlaza loans pursuant to the valid Inlaza Pledge. Likewise, SCBI asserts the GAC Account Documents are valid and enforceable documents that obligate GAC to repay any outstanding "Indebtedness" of GAC, which would include the unpaid Inlaza loan. Further, Defendants maintain that if we accept their argument on the Counterclaim then we must also accept their argument relating to Counts II-VIII of the Second Amended Complaint.

Turning to the Second Amended Complaint, Defendants contend that Counts II - V are predicated on a theory that Defendants wrongfully, and without authorization, sought to collect on Inlaza's outstanding credit obligations with GAC's account. Plaintiffs maintain this was improper and gives rise to various statutory and common law violations. However, assuming Defendants demonstrate as a matter of law that GAC is responsible for Inlaza's outstanding debts under contract, it follows that Defendants had a clear and unequivocal right to collect the unpaid amounts due and owing by Inlaza. Therefore, Defendants contend we should recommend granting partial summary judgment in favor of SCBI on Counts II, III, IV and V of the Second Amended Complaint.

As for Plaintiffs' fraud claims, Defendants contend that the Inlaza Pledge is clear, unambiguous and controls the result of this dispute. According to Defendants, the language of the Inlaza Pledge covers all relevant terms of the pledge and that, to

the extent Plaintiffs attempt to argue fraud, the merger doctrine and parol evidence rule bar any reliance on those purported misrepresentations.  Based on these contract principles, Defendants argue they are entitled to judgment as a matter of law on Count VI and GAC's affirmative defense of fraud.

Finally, Defendants contend they are entitled to summary judgment on Count VII and VIII because the Inlaza Pledge does not obligate SCBI to give Plaintiffs notice of any additional loans to Inlaza that would be covered under the Inlaza Pledge.  More generally, Defendants assert that Plaintiffs fail to establish that Defendants owed a fiduciary duty or any common law duty of care, let alone that they breached any such duty owed to Plaintiffs.

In response to these arguments, Plaintiffs side-step the contracts or their unambiguous terms and, instead, advance an argument that Defendants' purported fraud and the fraudulent statements made by Solorzano effectively "nullify" the Inlaza Pledge.  Plaintiffs maintain that the Defendants fraudulently induced M. Larach to execute blank pledge agreements under the guise that it was necessary to open an account with the Bank, and that it would be limited to that purpose.  However, Plaintiffs allege that the Banks used the blank pledge agreements to pledge GAC's account assets to secure loans for RF5 and Inlaza without Plaintiffs' knowledge or authority.  Continuing, Plaintiffs argue that had M. Larach known of the earlier fraudulent pledge in favor of RF5, he would not have executed the Inlaza Pledge.

Ultimately, we find Plaintiffs' fraud theory too attenuated to sufficiently demonstrate causation between the alleged RF5 fraud and the purported Inlaza fraud

and its corresponding damages.  This failure is highlighted by the fact that M. Larach: 1) approached Defendants to provide this loan to Inlaza; 2) specially deposited funds into GAC's account to facilitate these loans; and, 3) admittedly executed the Inlaza Pledge.  Moreover, we conclude that the Inlaza Pledge is a valid and enforceable agreement and that long-standing contract principles bar any reference to purported misrepresentations that seek to vary its terms.

## II.   ANALYSIS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers or other materials; or showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c)(1), (e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986); *Gonzalez v. Lee County Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998).  "In determining whether summary judgment is appropriate, the facts and inferences from the facts are viewed in the light most favorable to the non-moving party, and the burden is placed on the moving party to establish both the absence of a genuine material fact and that

it is entitled to judgment as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

However, the existence of a "scintilla" of evidence in support of the non-movant's position is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Young v. City of Palm Bay, Fla.,* 358 F.3d 859, 860 (11th Cir. 2004). Likewise, a court need not permit a case to go to a jury when the inferences that are drawn from the evidence, and upon which the non-movant relies, are "implausible." *Matsushita*, 475 U.S. at 592-94; *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). Speculation or conjecture from a party cannot create a genuine issue of material fact. *Cordoba v. Dillard's Inc.,* 419 F.3d 1169, 1181 (11th Cir. 2005).

### A. GAC has Defaulted and Breached its Obligations; Summary Judgment is Appropriate on Counts IV and V of the Counterclaim

SCBI asserts they are entitled to summary judgment as a matter of law on Counts IV and V of the Counterclaim. Specifically, SCBI argues there is no dispute with respect to these material facts: 1) GAC opened an account with AEBI; 2) M. Larach executed the GAC Account Documents; 3) Inlaza executed a Master Note in favor of AEBI with an original principal of $1,500,000.00; 4) AEBI loaned Inlaza $1,500,000.00; 5) M. Larach executed the Inlaza Pledge encumbering all of GAC's account assets; 6) Inlaza incurred additional debts from AEBI through overdrafts and letters of credits; 7) M. Larach acknowledged an additional loan to Inlaza for, at least, $200,000.00; 8) Inlaza defaulted under the terms of the Master Note; 9) GAC defaulted

11

under the terms of the Inlaza Pledge; and, 10) the remedies available to SCBI under the terms of the Inlaza Pledge and GAC Account Documents.  The undisputed record supports each of these propositions.

To prevail on a claim for breach of contract a party must show the existence of a contract, a breach thereof, and damages. *See Miller* v. *Nifakos,* 655 So. 2d 192 (Fla. 4th DCA 1995); *Brunswick Corp. v. Creel*, 471 So. 2d 617, 618 (Fla. 5th DCA 1985) (breach of guaranty is a contract claim).  As set forth above, SCBI establishes each element for its breach of contract claim and, specifically, that: 1) M. Larach executed the Inlaza Pledge and GAC Account Documents; 2) Inlaza and GAC defaulted under the terms of these agreement; and, 3) SCBI is damaged.  Therefore, SCBI is entitled to summary judgment under Counts VI and V of the Counterclaim.

Section II of the Inlaza Pledge, titled "PLEDGE OF PROPERTY," unequivocally states:

> As security for all obligations of [Inlaza] or [GAC] to [AEBI] (whether now existing or hereafter arising, whether absolute or contingent, whether originally owed to [AEBI] or acquired by [AEBI] by assignment, and however evidenced) (the "Obligations"), [GAC] pledge[s] and assign[s] to [AEBI] and grant[s] to [AEBI] a security interest in the property listed below.

Section III of the Inlaza Pledge, titled "PROPERTY COVERED BY THIS AGREEMENT," defines "property" as follows:

> (a) ***all*** deposits and accounts that [AEBI] or any of [AEBI's] affiliates (including but not limited to American Express Bank Ltd) hold in [GAC's] name or on [GAC's] behalf, including without limitation, (i) all such accounts containing, and all assets of [GAC's] constituting, securities

(certified or uncertified) and security entitlements, credit balances, financial assets and other investment property, financial instruments (including options, futures and warrants), foreign exchange and forward contracts, cash equivalents and any other property, and (ii) all [GAC's] rights with respect to the above;

(b) *__all__* dividends, additions and rights connected with any property mentioned in this section; and

(c) *__all__* proceeds of any of the Property from time to time received, receivable, or otherwise distributed in respect of or in exchange therefor, at any time held in such accounts or delivered to [AEBI] pursuant to [GAC's] Discretionary Investment Management Agreement or otherwise, and all certificates therefor, interest thereon, renewals thereof, and substitutions therefor. (emphasis added).

Plainly, the Inlaza Pledge secures *all* obligations of GAC (including the Inlaza loan) owed to AEBI with *all* of GAC's assets held by AEBI (now SCBI).  In the event of a default, Section VI(1) of the Inlaza Pledge, titled "[SCBI's] REMEDIES," explicitly outlines SCBI's remedies and GAC's obligations:

If *any* obligation secured hereby is not timely fulfilled, if [GAC] or [Inlaza] has defaulted under any promissory note or other agreement evidencing any such obligation, if [GAC] or [Inlaza] become the subject of bankruptcy or insolvency proceedings in any jurisdiction, if [GAC] fail[s] to perform any provision of this pledge or if [GAC] breach[es] any representation or warranty in this Pledge (each of the foregoing being an "*event of default*") [AEBI] may do any of the following: a) apply to the obligations secured hereby any funds in any account of any other Property; b) sell, lease, or otherwise dispose of the Property at public or private sale; c) retain any Property and send [GAC] any required notice of retention; d) request payment from any person or entity holding an interest in the Property; and, e) take any other action permitted by law. (emphasis added).

13

It is undisputed that both Inlaza *and* GAC failed repay the loan obligation to AEBI and, as an "event of default," SCBI may apply GAC's account to satisfy Inlaza's obligation secured by the Inlaza Pledge.  In light of the clear language of the Inlaza Pledge *and* GAC's failure to controvert the facts supporting SCBI's claim, we conclude that the record sufficiently establishes GAC's liability under this agreement.  *See, e.g., Bank First v. Guillem*, No. 6:09-cv-152-Orl-31KRS, 2009 WL 1930190, *5 (M.D. Fla. June 30, 2009) (citing Florida law; breach of guaranty established by record and plaintiff's failure to refute allegations in opposition to summary judgment).  Thus, SCBI is entitled to summary judgment against GAC with respect to Count IV of the Counterclaim.

SCBI is also entitled to partial summary judgment under Count V of the Counterclaim against GAC for damages relating to the Inlaza loans incurred by SCBI under the GAC Account Documents.  Admittedly, M. Larach opened GAC's account and, therefore, GAC is bound by the terms that govern it. [D.E. 86 at ¶¶ 4-8].  Specifically, Section 6 of the Account Rules and Regulations provides that GAC:

> pledges, assigns and grants a continuing security interest in, and continuing lien upon, all accounts of [GAC] with AEBI or any of the Related Institutions and all other Property[6] (all such accounts and other Property being the "Collateral"), as security for payment of *any Indebtedness, including without limitation, any overdraft.*  Upon any default by [GAC] in the payment when due of *any Indebtedness or in the performance of any related obligations* to AEBI, AEBI is hereby authorized to set off and apply any

---

[6] In short, "Property" includes all assets of the GAC account.  The definition is comparable in scope as that set forth in the Inlaza Pledge, *supra.*

> Collateral constituting funds or the equivalent of funds against such Indebtedness, and to sell or otherwise realize upon any Collateral and apply the proceeds thereof against such Indebtedness... .

Section 1 of the Account Rules and Regulations defines "Indebtedness" as:

> All present or future obligations, indebtedness and/or liabilities of [GAC] to AEBI or any of the Related Institutions, of any kind, direct or indirect, contractual or tort, liquidated or unliquidated, secured or unsecured, joint, several, joint and several, absolute or contingent due or not due, now existing or hereafter arising, and whether in U.S. Dollars or Foreign Currency, including, without limitation, principal, interest, commissions, fees, charges, costs and expenses (including reasonable legal fees and expenses) incurred by AEBI or any of the Related Institutions in connection with such obligations, indebtedness or liabilities.

Lastly, Section 4 of the Account Rules and Regulations "irrevocably authorize[s] [AEBI] to block, retain and not repay any amount whatsoever which may be owing by AEBI or any Related Institutions to [GAC] or any moneys whatsoever which AEBI or any of the Related Institutions may hold in any account of [GAC] ... *unless and until the Indebtedness shall be repaid and/or discharged in full.*" (emphasis added).

Together, these provisions permit SCBI to recover any outstanding *Indebtedness*, including GAC's Inlaza Pledge obligations, with GAC's account assets. Furthermore, SCBI is "irrevocably authorized" to "block" and "retain" these assets until the Indebtedness is paid. Put another way, GAC's Account Documents provide SCBI an alternative, albeit more general, avenue to secure repayment of its loans to Inlaza. Importantly, as noted above, Plaintiffs do not dispute these specific facts. Accordingly,

15

SCBI is entitled to partial summary judgment against GAC with respect to Count V of the Counterclaim – as it relates to Inlaza *only*.

### B.      *Counts II - V of the Second Amended Complaint*

Plaintiffs claim the Defendants "misrepresent[ed] the outstanding balances and amounts on monthly statements", "misappropriate[d] Plaintiffs' funds," (Count II) "collected amounts that [were] not due and owing," (Count III) "us[ed] forged debt instruments and the confiscation of account funds," (Count IV) and improperly "froze Plaintiffs' account ... and refuse to give Plaintiffs access" (Count V). These counts are predicated on Plaintiffs' theory that SCBI had no right to freeze GAC's account. However, based on the foregoing and pursuant to the Inlaza Pledge and GAC Account Documents, SCBI as a matter of law is permitted to secure repayment of Inlaza's outstanding debts with GAC's account assets. Therefore, we find partial summary judgment should be granted on Counts II, III, IV and V of the Second Amended Complaint as those counts relate to Inlaza.

### C.      *Plaintiffs' Fraud Claims*

#### 1.      *The purported "Inlaza" fraud*

Plaintiffs advance the argument that Defendants engaged in fraudulent conduct precluding entry of summary judgment on Counts IV and V of the Counterclaim, GAC's fraud affirmative defense and the Second Amended Complaint.[7]  Plaintiffs argue that

---

[7] To be clear, GAC's affirmative defense merely states, "[SCBI's] claims are barred by its own fraud." [D.E. 66]. SCBI contends that this affirmative defense fails as a matter of law pursuant to Fed. R. Civ. P. 8 & 9(b). We find this argument unavailing because when viewed in the context of Plaintiffs' Second Amended

Solarzano made various fraudulent misrepresentations to M. Larach that induced him into executing the Inlaza Pledge.  These *oral* misrepresentations, which *preceded* M. Larach's execution of both Inlaza Pledge documents, are: 1) the February 13, 2007 Inlaza general pledge agreement was limited to a $1.5 Million Inlaza loan; 2) the March 19, 2008 was also limited to a $1.5 Million Inlaza loan; and, 3) that M. Larach's acknowledgment of the additional $200,000 loaned to Inlaza would only increase GAC's pledge obligation by that amount.  Put differently, Plaintiffs maintain that GAC is responsible for, at most, $1.7 Million of Inlaza's loans.

Plaintiffs assert the Defendants tricked M. Larach into *unknowingly* executing various blank pledge agreements.  And, Defendants then used the unauthorized, executed pledge agreements to loan *M. Larach's son's company RF5* approximately $1.85 Million secured by GAC's account assets.[8]  Then again, the Defendants purportedly induced M. Larach to *unknowingly* execute yet another pledge agreement encumbering *all* of GAC's account assets (rather than only $1.7 Million) to secure a

---

Complaint, and this matter broadly, the purported "fraud" GAC refers to is obvious. Further, Judge Moreno previously deemed the fraud claim well pled. *See* [D.E. 42].

[8] It is undisputed that M. Larach executed a general blank pledge agreement to open his accounts with AEBI/SCBI.  The agreement includes a line for "Borrower" with a notation under the blank space reading "if other than Pledgor."  Thus, the document signed by M. Larach when he opened his accounts would remain blank and operate as a pledge of GAC's assets for any and all of GAC's obligations.  However, this same document could be utilized to secure a third-party pledge (i.e. to RF5 or Inlaza) by inserting their names on the "Borrower" line.  Thus, the versatility of the general pledge agreement and the arguable ease of listing a third-party as the "Borrower" is at the heart of Plaintiffs' purported fraud.  This is, allegedly, what Defendants did with the RF5 loan.

loan to *M. Larach's other son's company Inlaza*.  Plaintiffs underscore their fraud theory by alleging the Defendants concealed their fraud by "doctoring" GAC's monthly statements to reflect zero liabilities.  M. Larach maintains that he never authorized a pledge to secure a loan to RF5 and that, had he known of this fraud and liabilities, M. Larach would not have executed the Inlaza Pledge.  Furthermore, to the extent M. Larach did authorize loans to Inlaza, he contends the pledge was authorized for $1.7 Million only.

In response to Plaintiffs' broad fraud theory, Defendants focus on Inlaza and the Inlaza-related misrepresentations rather than directly responding to Plaintiffs' broad RF5 fraud argument.  With regard to Inlaza, we conclude that Plaintiffs' argument fails for three salient reasons.  First, generally speaking, contract principles of merger and parol evidence bar any reference to purported prior or contemporaneous oral representations that attempt to vary the Inlaza Pledge.  Second, Plaintiffs' reliance on the "inducement" exception to the parol evidence rule is inapplicable.  And, third, assuming the "inducement" exception did apply, M. Larach was unjustified in relying on purported misrepresentations as a matter of law.  Finally, turning to Plaintiffs' broad theory, we conclude that it too fails as a matter of law to preclude summary judgment as to Inlaza.

Notably, Plaintiffs raise no argument questioning the terms of either the GAC Account Documents or the Inlaza Pledge.  If a contract's terms are clear and unambiguous, "language itself is the best evidence of the parties' intent and its plain meaning controls." *Palm Beach Pain Mgmt., Inc. v. Carroll*, 7 So. 3d 1144, 1145 (Fla.

4th DCA 2009) (internal citations omitted). "It is settled law in Florida that a court may resort to the process of interpretation only when the words used in a contract are unclear." *Sims v. New Falls Corp.*, 37 So. 3d 358, 361 (Fla. 3d DCA 2010). Since the language is clear, the court must rely on the plain meaning of the contract. *See Hurt v. Leatherby Ins. Co.*, 380 So. 2d 432, 433 (Fla. 1980). Indeed, when the unambiguous terms of the contract are conclusive, the intention of the parties is determined by the express language used in the instrument. *Medanic v. Citicorp Inc. Services*, 954 So. 2d 1210, 1212 (Fla. 3d DCA 2007). The construction of an unambiguous contract is a question of law to be resolved by the court, and not a jury. *See Hall v. Burger King Corp.*, 912 F. Supp. 1509, 1520 (S.D. Fla. 1995).

Applying these principles here, there is no question that the unambiguous terms of the GAC Account Documents and Inlaza Pledge fully support the relief sought in SCBI's Counterclaim. However, Plaintiffs argue that Solorzano made certain oral misrepresentations to M. Larach that limited the scope of the Inlaza Pledge to, at most, $1.7 Million.

In the contractual context, Plaintiffs' argument raises classic merger and parol evidence doctrine issues. These doctrines are intertwined. The merger or integration doctrine provides that "representations, negotiations and conversations which precede and accompany the making of a contract are presumed to have merged into the contract." *Wickenheiser v. Ramm Vending Promotion, Inc.*, 560 So. 2d 350, 352 (Fla. 5th DCA 1990). The inclusion of a merger or integration clause is one way for parties to

19

evince their intent that a written contract is their final and complete agreement. *Johnson Enters. of Jacksonville v. FPL Group, Inc.*, 162 F.3d 1290, 1308 (11th Cir. 1998).   However, the merger doctrine is not contingent on the inclusion of such a clause. *In re Yates Development, Inc.*, 241 B.R. 247, 254 (M.D. Fla. 1999) (citing *Johnson Enters*, 162 F.3d at 1308); *see also Peterson v. Howell*, 126 So. 362, 365 (Fla. 1930) (a written contract merges all prior or contemporaneous negotiations in reference to the same subject matter into the written contract).

Ultimately, the intent of the parties determines whether a document is merged. "The chief and most satisfactory index to determine the intent of the parties to an agreement as to whether they intended their written contract to be a complete and final statement of the whole transaction is whether or not the particular element of the alleged extrinsic negotiation is dealt with at all in the writing." *Carolina Metal Products Corp. v. Larson*, 389 F.2d 490, 492 (5th Cir. 1968) (citing Florida law).[9]   "If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction that element." *Id.* at 493 (affirming district court's conclusion that the contract was a complete integration notwithstanding the absence of an integration clause); *see also Greenwald v. Food Fair Stores Corp.*, 100 So. 2d 200, 202 (Fla. 3d DCA 1958).

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 & 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981."

In turn, the parol evidence rule enforces the merger doctrine. "[E]vidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract." *Ungerleider, M.D. v. Gordon*, 214 F.3d 1279, 1282 (M.D. Fla. 1990) (citing *Johnson Enters.*, 162 F.3d at 1309). In other words, once negotiations are finalized and a contract's terms are set to writing, the resulting document shall not be altered by prior or contemporaneous oral statements. T h e Inlaza Pledge does not include a merger clause. However, as analogous to *Carolina Metal*, the Inlaza Pledge is merged (at least as it matters here) because the "particular element of the alleged extrinsic negotiation" is specifically "dealt with ... in the writing." Thus, while Plaintiffs maintain that M. Larach orally agreed to pledge GAC's assets to secure only $1.7 Million of Inlaza's loans, it is apparent that the Inlaza Pledge *explicitly and unambiguously* contradicts this assertion and extends to *all obligations* of Inlaza. We conclude the Inlaza Pledge and GAC Account Documents are fully integrated, unambiguous contracts that expressly pledge all of GAC's account assets to secure Inlaza's outstanding liabilities. *See Carolina Metal*, 389 F.2d at 492-93.

Typically, this conclusion would bar any reliance on extrinsic evidence. *See, e.g., Mullins v. Sunshine State Serv. Corp.*, 540 So. 2d 222, 223 (Fla. 5th DCA 1989). However, Plaintiffs contend that these statements are relevant because Defendants made these misrepresentations with the intent to fraudulently induce M. Larach into executing the Inlaza Pledge. Florida courts recognize a narrow exception to the parol evidence rule based on this "inducement" argument. *See Ungerleider, M.D.*, 214 F.3d

at 1282; *Johnsone Enters.,* 162 F.3d at 1309-10.  Plaintiffs rely on *Meterlogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346 (S.D. Fla. 2000) to support this position. But, *Meterlogic* is distinguishable and thus the "inducement" exception is inapplicable.

*Meterlogic* stands for the proposition that the merger doctrine shall not cloak fraudulent conduct that induces a recipient to enter into a contract and that, notwithstanding the parol evidence rule, oral representations may be introduced to establish fraud. *Id.* at 1363; *see also  Mejia v. Jurich*, 781 So. 2d 1175 (Fla. 3d DCA 2001).  However, *Meterlogic*, and its progeny, share a crucial distinction that erodes any support for Plaintiffs' position.  That is, the "inducing" misrepresentation must relate to an issue that *falls outside* of the four corners of the written contract. *Meterlogic*, 126 F. Supp. 2d at 1362 (court justified exception to parol evidence rule because the representations were not covered in the agreement stating, "the most important representations [relied on by plaintiffs] ... were not embodied in the parties' contracts, and they are the types of allegations that fall under the justification for the fraud exception... ."); *see also S&B Investments, LLC v. Motiva Enterprises, L.L.C.*, No. 03-61993-CIV-Martinez/Klein, 2004 WL 3250306, at *5 (S.D. Fla. Dec. 06, 2004) (recognizing the fraudulent "inducement" exception to the parol evidence/merger doctrine is restricted to representations not covered by the contract and, thus, *Meterlogic,* and its progeny, are inapplicable here), *aff'd and adopted*, 03-61993-CIV-Martinez/Klein (S.D. Fla. Feb. 28, 2005).

As noted, the Inlaza Pledge *specifically* dealt with the subject matter of the agreement's scope and that, without question, the unambiguous agreement reaches *all* of Inlaza's obligations to AEBI. As this court explained recently, the "'fraudulent inducement' exception is not applicable where the alleged oral agreement relates to the identical subject matter embodied in the written agreement, and directly contradicts the express terms of the agreement." *Regions Bank v. Old Jupiter, LLC*, No. 10-80188-CIV, 2010 WL 5148467, at *3 (S.D. Fla. Dec. 13, 2010) (citations omitted). Accordingly, the "inducement" exception is inapplicable and any reliance on extrinsic evidence is barred.

However, assuming *arguendo* that the purported oral representations are not barred by these applicable contract principles, we would still conclude as a matter of law that Plaintiffs' fraud argument fails because M. Larach was unjustified in his reliance on the representations. To establish a claim of fraudulent inducement, Plaintiffs have the burden of showing that: 1) the Defendants misrepresented a material fact; 2) the Defendants knew or should have known that the representation was false; 3) the Defendants intended that the misrepresentation would induce M. Larach to execute the agreements; 4) M. Larach signed the agreement in justifiable reliance on the misrepresentation; and, 5) Plaintiffs were injured. *See Addison v. Carballosa*, 48 So. 3d 951, 954 (Fla. 3d DCA 2010). However, based on M. Larach's own sworn testimony and the record in this case, Plaintiffs fail to establish a fraudulent inducement claim as a matter of law. *See Hall*, 912 F. Supp. at 1521-22

23

(where evidence establishes plaintiffs' reliance was not justified, a court may rule as a matter of law that fraudulent inducement claim fails).

It is axiomatic that a person who signs a contract is presumed to known its contents. *Addison*, 48 So. 3d at 954. Furthermore, "it is generally the duty of a party to a contract to learn and understand its contents before he signs it." *Id.* (citing *Pepple v. Rogers*, 140 So. 205, 208 (Fla. 1932)). Thus, a party to a written contract cannot defend against its enforcement because he neglected to read it. *See Parham v. E. Bay Raceway*, 442 So. 2d 399, 400-01 (Fla. 2d DCA 1983). This holds true even when a party is unable to read an English language contract. *See Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Benton*, 467 So. 2d 311, 313 (Fla. 5th DCA 1985); *Sutton v. Crane*, 101 So. 2d 823, 825 (Fla. 2d DCA 1958) (citing 12 Am. Jr., Contracts § 137) ("If a person cannot read the instrument ... his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents.").

However, this failure to read or review a contract must be voluntary. As *Addison* explains:

> if a party to a written contract was prevented from reading it or he was fraudulently induced to sign the contract without reading it due to misrepresentations upon which he justifiably relied, he may be able to defend against its enforcement. Justifiable reliance, however, does not permit the recipient of a fraudulent misrepresentation to blindly rely on it. Thus, a misrepresentation is not actionable where its truth might have been discovered by the exercise of ordinary diligence.

*Id.* at 955 (quotations and citations omitted).  M. Larach admits that he received both an email copy and an in person copy of the Inlaza Pledge and that he understands English, at least enough to review his English language monthly bank statements.[10] M. Larach also admits that he did not: 1) read the Inlaza Pledge;[11] 2) review the Inlaza Pledge Agreement; or, 3) solicit any advice about whether or not to sign the document. Thus, the record establishes that M. Larach executed the Inlaza Pledge without reading or knowing the contents the of agreement even though he had an opportunity to do so.  As such, M. Larach's failure to read the Inlaza Pledge is no excuse to avoid its terms.  *See, e.g., Merrill*, 467 So. 2d at 312-13 (holding plaintiff who is unable to read English was still bound to the terms of the contract where there is no allegation that defendant prevented plaintiff from reading the contract or induced her to refrain from reading it in any way); *see also Allied Van Lines, Inc. v. Bratton*, 351 So. 2d 344, 347 (Fla. 1977) ("[u]nless one can show facts and circumstances to demonstrate that he was prevented from reading the contract, or that he was induced by statements of the other party to refrain from reading the contract, it is binding.")

Nevertheless, Plaintiffs gloss over those salient facts and instead advance a "lessor of two evils" argument set forth in *Besset v. Basnett*, 389 So. 2d 995 (Fla. 1980)

---

[10] M. Larach Dep. 36:20-22; 98:12-17.

[11] There is no question that M. Larach had **ample** opportunity to review the general pledge agreements.  Indeed, the record is replete with opportunities including the two Inlaza general pledge agreements M. Larach admits to executing as well as the other blank general pledge agreements M. Larach "believes that he likely signed ... during the course of [his relationship with Defendants]." [D.E. 84 at p. 8].

25

in an attempt to place undue emphasis on Defendants' purported misrepresentations.
In *Besset*, the Florida Supreme Court retracted from *caveat emptor* relating to
misrepresentation, adopted Sections 540 and 541 of the Restatement (Second) of Torts
(1977) and explained:

> A person guilty of fraud should not be permitted to use the
> law as a shield.  Nor should the law encourage negligence.
> However, when the choice is between the two – fraud and
> negligence – negligence is less objectionable than fraud.
> Though one should not be inattentive to one's business
> affairs, the law should not permit an inattentive person to
> suffer loss at the hands of a misrepresenter.

*Id.* at 997-98.  However, as with *Meterlogic*, Plaintiffs misapprehend the full holding
of the court.  *Besset* holds "a recipient may rely on the truth of a representation, even
though its falsity could have been ascertained had he made an investigation, ***unless
he knows the representation to b false or its falsity is obvious to him*.*"  *Id.* at
998. (emphasis added).  This caveat is further illustrated in comment a of Section 541
of the Restatement (Second) of Torts: "If one induces another to buy a horse by
representing it to be sound, the purchaser cannot recover even though the horse has
but one eye, if the horse is shown to the purchaser before he buys it and the slightest
inspection would have disclosed the defect." *See also Addison*, 48 So. 3d at 957 (citing
persuasively to the Restatement (Second) of Torts § 541, cmt. a (1977)).

Thus, even assuming Solarzano made those representations to M. Larach, a
cursory reading of the ***two page*** Inlaza Pledge would have disclosed that these
purported oral representations conflicted with the terms of the Inlaza Pledge.

Paragraph III, titled "PROPERTY COVERED BY THIS AGREEMENT" states, in conspicuous and unambiguous language, "the following property is covered by this pledge: ... *all* deposits and accounts that [GAC] ... hold[s] ... ." (emphasis added). Under these circumstances, M. Larach's alleged reliance was unjustified as a matter of law.[12] *See Hall*, 912 F. Supp. at 1522-23 (holding that even if the representations were false, and these representations induced the plaintiffs to sign the contract, their reliance was unjustified where the terms of the contract are clear); *Addison*, 48 So. 3d at 956-57 (same).  Therefore, we conclude Plaintiffs' fraudulent inducement argument fails and summary judgment in Defendants' favor is warranted on Count VI of the Second Amended Complaint and Plaintiffs' fraud affirmative defense to the Counterclaim (as they relate to Inlaza).

> 2.     *Plaintiffs' Broad Fraud Theory: RF5 and Inlaza*

We recognize that Plaintiffs' fraud theory focuses on a purported larger fraud that incorporates an argument that Defendants fraudulently induced M. Larach to authorize the Inlaza Pledge by concealing the Defendants' purported earlier fraud relating to RF5.  Plaintiffs contend that had M. Larach known of the RF5 loan he would not have executed the subsequent Inlaza Pledge.  Defendants' Motion explicitly avoids any mention of RF5 and focuses solely on Inlaza.  Notwithstanding Plaintiffs' argument or Defendants' attempt to avoid it, we conclude that Plaintiffs' broader fraud

---

[12] To the extent Plaintiffs attempt to portray M. Larach as uneducated in business affairs, we reject this characterization as both  irrelevant as a matter of law and belied by the record.

theory still fails to preclude summary judgment relating to Inlaza because it cannot establish causation as a matter of law.

Generally, courts must view the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Porter v. White*, 483 F.3d 1294, 1302 (11th Cir. 2007). However, this principle does not bind a court to accept implausible, uncorroborated, conclusory or substantially self-serving conclusions to create disputes of material fact where none exist. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion).

We find Plaintiffs' broad fraud theory, and the facts on which it relies, too attenuated to create a genuine dispute of material fact to overcome Defendants' well supported summary judgment motion. To illustrate, a California appellate court dealt with a comparable fraud theory and, after struggling with plaintiff's causation argument, ultimately concluded the facts were too attenuated and ruled in favor of the alleged misrepresenting defendants. *See Coronado City Views, LLC v. Regatta Bay, LLC*, No. D053210, 2010 WL 453555 (Cal. App. 4th 2010). In *Coronado*:

> [Plaintiff] alleged it entered into the utility agreement in reliance on defendants' representation Regatta Bay owned lot 8 free and clear and it was available for the transformer location. Defendants did not disclose that lot 8 was subject to a lease between the seller and seller's business tenant, under which the tenant had a right of first refusal, and that the tenant was disputing Regatta Bay's ownership of lot 8. [Plaintiff] argued that had it known these facts it would not have entered into the utility agreement, and would instead

28

> have handled the utility conversion itself, ostensibly more
> quickly than defendants did, thereby avoiding delay in
> completing its project.[13]

*Id.* at \*1.  *Coronado* concluded that plaintiff's misrepresentations relating to placing the transformer on lot 8 (i.e. the "inducement") was not sufficiently related to plaintiff's purported damages to establish causation.  The court explained that if it was to accept plaintiff's theory then "even the most innocuous of misstatements or omissions would give rise to a fraud claim for damages arising from an entirely different aspect of the parties' deal.  In other words, [plaintiff's] theory abrogates the requirement that the specific misrepresentation that induced the plaintiff's reliance, and which is the subject of the lawsuit, must be directly connected to the claimed damages." *Id.* at \*11.  Like *Coronado*, Plaintiffs place too much focus on the broad fraud theory in an attempt to obscure the Inlaza issue and the clear, overwhelming fact that M. Larach personally sought out and secured the loan for Inlaza.

The law applied in *Coronado* is comparable in Florida.  Indeed, Florida also requires plaintiffs to establish a casual relationship between the purported misrepresentation and the resulting damage to prevail on a fraud claim.  *See In re Lichtman*, 388 B.R. 396, 410-11 (M.D. Fla. 2008) (citing Florida law; a plaintiff cannot recover on common law fraud or negligent misrepresentation theory, even though plaintiff claims to have been misled, if plaintiff cannot demonstrate a causal connection between defendant's conduct and plaintiff's misapprehension); *see also Simon v.*

---

[13] There is no question *Coronado* is not binding and of little precedent in terms of weight.  However, the well reasoned opinion is instructive here.

*Celebration Co.,* 883 So. 2d 826, 833 (Fla. 5th DCA 2004) (citing *Tampa Union Term., Co., v. Richards*, 146 So. 591, 594 (1933)); Fla. Jur. 2d, Fraud § 49 (2011).

Here, Plaintiffs argue representations or omissions relating to RF5 contributed to M. Larach's reliance on Solorzano's representations and this induced his execution of the Inlaza Pledge.  However, such reliance on unrelated representations is largely irrelevant to the Inlaza loan because there is no evidence beyond M. Larach's conclusory and speculative statements to suggest that those representations would have induced, or not induced, the Inlaza loan.   This is because, for starters, the RF5 and Inlaza loans were separate and distinct events rather than parts of a single transaction.  Moreover, M. Larach specifically approached Solorzano to arrange a loan for Inlaza and he deposited an additional $1.5 Million into GAC's account to facilitate this loan.   Thus, it is difficult to accept Plaintiffs' argument when M. Larach independently encumbered additional and secondary monies for the Inlaza loan. Further still, the only support for Plaintiffs' argument is M. Larach's conclusory statement that he wouldn't have authorized the pledge or loan to Inlaza had he known of the RF5 loan.  However, as set forth above, Plaintiffs' conclusory statements are insufficient to create a genuine dispute of fact and we conclude Plaintiffs fail to establish causation as a matter of law.

Beyond this causation issue, we underscore our conclusion by noting certain "red flags" that cut against Plaintiffs' argument.  *First*, Plaintiffs fail to cite to a single analogous case that discusses a comparable fraud theory (let alone provides the relief Plaintiffs are seeking).  Notably, outside general proposition cases (i.e. standard,

30

elements of fraud), Plaintiffs rely on two cases: *Meterlogic* and *Besett*.  However, these cases are distinguishable and provide little support for Plaintiffs' argument.

*Second*, Plaintiffs fail to establish any disputes of fact *relating to Inlaza*.  Indeed, the source of most of Plaintiffs' facts is M. Larach who provides only self-serving deposition and declaration testimony.  However, these facts are uncorroborated despite the reality that M. Larach's sons, i.e. the "Borrowers," are the most relevant (yet missing) sources for such corroborating testimony.[14]

In other regards, Plaintiffs attempt to create a dispute of fact with flatly unsubstantiated, speculative and controverted facts.  For instance, they assert the Defendants "doctored" GAC's monthly statements and give great weight to the purported discrepancy between GAC's December 2008 statement (reflecting - for the first time - approximately $3.8 Million in liabilities) and its November 2008 statement (reflecting zero liabilities). [D.E. 93 at p. 13].  Plaintiffs argue that this discrepancy establishes that the Defendants purposefully concealed the unauthorized pledges to RF5 to induce the Inlaza pledge.[15]  However, the record belies this position because

---

[14] M. Larach admits to maintaining a close relationship with his sons.  At the time of M. Larach's deposition, Oscar Larach resided with him. M. Larach Dep. at 7:25 – 8:1-2.  Also, M. Larach sees Rubin Larach often at "family gatherings that are done once a week, at the luncheon, or on Sundays when [Rubin] comes to visit me." *Id.* at 74:13-17.  However, neither son provides any support for M. Larach's position.  (We acknowledge  Plaintiffs' have no affirmative obligation to proffer their testimony, but recognize it seems peculiar under these facts.)

[15] Plaintiffs maintain this assertion without even attempting to accord the fact that the Inlaza general pledge agreement was also not included on GAC's monthly statements.  If Defendants "doctored" GAC's monthly statements to conceal the RF5 pledges when, according to Plaintiffs, the Banks should have listed the pledged loans

multiple employees of the Defendants proffered testimony that a "pledge" is not considered a liability by the Bank and, therefore, it would not appear on GAC's monthly statements.[16]   Indeed, the only support for Plaintiffs' allegation is that another, unrelated Bank employee, at some point in time, doctored a client's documents.  *See* [D.E 114-17, Steven Vogal Deposition p. 57:2 – 58:18].  However, this conclusory allegation, without more, cannot support Plaintiffs' argument to preclude summary judgment.

*Third*, M. Larach sought out and procured the Inlaza loan.  In fact, M. Larach wanted to give Oscar Larach money, but decided to make this loan through Defendants to ensure that Oscar Larach would treat the loan responsibly.  This fact cannot be more relevant.

Altogether, we conclude that Plaintiffs' attenuated theory and the various "red flags" compel our conclusion that summary judgment should be entered in Defendants' favor on Count VI of the Second Amended Complaint and GAC's fraud affirmative defense as they relate to the Inlaza loans.

**D.      *Counts VII and VIII of the Second Amended Complaint***

Counts VII and VIII of the Second Amended Complaint claim Defendants breached their fiduciary duties and were negligent in handling GAC's account by,

---

as liabilities, then why would the Banks maintain this ruse in light of M. Larach's *full knowledge and consent* to the Inlaza pledge agreement?

[16] Intuitively, this makes sense.  A liability is a current debt while a pledge agreement merely evinces a potential debt that remains arises only if and when certain conditions precedent occur, i.e., an event of default.

among other things: 1) allowing Inlaza to borrow significant monies without Plaintiffs'
approval; 2) never informing Plaintiffs that the account was encumbered by the Inlaza
loan; 3) wrongfully securing the Inlaza loan with Plaintiffs' assets without their
consent; 4) wrongfully depriving the Plaintiffs of the unencumbered access to their
accounts; 5) not providing appropriate documents for securing third party loans; 6)
producing documents purportedly containing Plaintiffs signatures that were never
signed or executed by the Plaintiffs; and, 7) seizing Plaintiffs' funds including a special
deposit. [D.E. 18 at ¶¶ 71,75].

Under Florida law, "[t]he elements of a claim for breach of fiduciary duty are:
the existence of a fiduciary duty, and the breach of that duty such that it is the
proximate cause of the plaintiffs damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla.
2002). "One in such a fiduciary relationship is subject to legal responsibility for harm
flowing from a breach of fiduciary duty imposed by the relationship." *Id.* at 352.

"To establish a fiduciary relationship, a party must allege some degree of
dependency on one side and some degree of undertaking on the other side to advise,
counsel, and protect the weaker party." *Watkins v. NCNB Nat'l Bank, N.A.*, 622 So. 2d
1063, 1065 (Fla. 3d DCA 1993) (quoting *Bankest Imports, Inc. v. ISCA Corp.*, 717 F.
Supp. 1537, 1541 (S.D. Fla. 1989)). Generally, "[i]n an arms-length transaction,
however, there is no duty imposed on either party to act for the benefit or protection
of the other party, or to disclose facts that the other party could, by its own diligence
have discovered." *Id.* (quoting *Lanz v. Resolution Trust Corp.*, 764 F. Supp. 176, 179
(S.D. Fla. 1991)). "Under Florida law, it is clear that a lender does not ordinarily owe

fiduciary duties to its borrower." *Motorcity of Jacksonville, Ltd. v. Se. Bank N.A.*, 83 F.3d 1317, 1339 (11th Cir.1996). "One may not ... unilaterally impose a fiduciary relationship [on a lender] without a conscious assumption of such duties by [the lender] to be held liable as a fiduciary." *Id.* (quoting *Denison State Bank v. Madeira*, 640 P.2d 1235, 1244 (1982)). Among other things, there must be "circumstances exceeding an ordinary commercial transaction." *Id.* at 1340 (quoting *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 521 (Fla. 3d DCA 1994)). "[I]t is clear that [a lender's] long standing business relationship with [a borrower], without more, cannot transform the lender-borrower relationship into a fiduciary one." *Id.* at 1340 n. 21.

Here, Plaintiffs have not established that Defendants owed a fiduciary duty. In *Jaffe v. Bank of America, N.A.*, 667 F. Supp. 2d 1299 (S.D. Fla. 2009), the court determined, under analogous facts, that an otherwise arms-length, lender-borrower relationship based on nothing more than a long standing business relationship (like that between M. Larach and the Banks) is not enough to establish a fiduciary duty. *Id.* at 1319-20; *see also Motorcity of Jacksonville*, 83 F. 3d at 1340 n. 21. The record here is devoid of any request by Plaintiffs to Defendants to undertake a duty of trust and dependency, and the record is likewise devoid of any evidence of Defendants ever agreeing to assume such a duty. Thus, without more, no fiduciary duty relationship exists under the facts of this case. Accordingly, we conclude Defendants' summary judgment motion should be granted as to Count VII of the Second Amended Complaint.

34

Moreover, summary judgment is warranted on Count VIII based on the Inlaza Pledge. Plaintiffs' argument, at least in part,[17] relates to "notice" and asserts that Defendants were negligent by failing to obtain approval from Plaintiffs to "allow[] Inlaza ... to borrow ... against Plaintiffs' account ... ." The Inlaza Pledge touches on this subject stating, "[GAC] agree[s] that [AEBI] is not obligated to give [GAC] notice of ... the existence of new, renewed, extended, or modified obligations covered by this Pledge." However, Plaintiffs assert, in effect, that through course and conduct the Parties modified the Inlaza Pledge on or about July 30, 2008 when M. Larach authorized the Banks to permit a $200,000.00 overdraft for Inlaza. Plaintiffs' argue that this "modification" imposed a duty on Defendants to give notice to and receive authorization from Plaintiffs for additional loans to Inlaza. Defendants contend, however, that the Inlaza Pledge's "no oral modification" clause precludes such a modification.

A subsequent oral modification of a contract, notwithstanding a "no oral modification" clause, is permitted when established through course and conduct. *See Allpattah Services, Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1316-17 (S.D. Fla. 1999) ("while a written agreement may provide that it cannot be modified except by a writing signed by both parties ... the agreement can be changed by a course of actual performance.") (quotations and citations omitted). However, course of conduct alone, without demonstrating mutual consent supported by consideration, will not support

_____

[17] These claims also incorporate fraud and contract issues resolved above.

35

modification.  *See Rhodes v. BLP Associations, Inc.*, 944 So. 2d 527, 530 (Fla. 4th DCA 2006) (finding written agreement was modified by subsequent course of conduct because evidence demonstrated mutual consent and consideration).  Here, there is no evidence of mutual consent or consideration.  At most, this may have been a courtesy to Plaintiffs.

Regardless, this issue is irrelevant.  The record reflects that all loans to Inlaza *preceded* the purported July 30, 2008 modification.  Thus, if the Parties indeed modified the Inlaza Pledge to impose a duty on Defendants to either provide notice to or receive authorization from M. Larach, this duty arose after most loans to Inlaza and contemporaneously with the final $200,000.00 overdraft.  Put differently, assuming the Parties had modified their agreement, Defendants conformed to this duty in the one instance it existed.  Therefore, we find partial summary judgment should be granted on Counts VII and VIII of the Second Amended Complaint as those counts relate to Inlaza.

### III.  CONCLUSION

It is undisputed that M. Larach approached the Defendants and requested that they facilitate a loan to Oscar Larach's company Inlaza.  In furtherance of this loan, M. Larach deposited additional money into GAC's account and executed the Inlaza Pledge.  Thereafter, M. Larach acknowledged at least one overdraft to Inlaza. Defendants acquiesced to M. Larach's request and made loans to Inlaza.  There is no question that M. Larach's Inlaza Pledge secured repayment of the Inlaza loan in the event of default.  Inlaza defaulted.  Thus, it logically follows Plaintiffs are responsible

36

to repay this secured debt.  The alternative conclusion produces a wholly inequitable result with Defendants incurring a significant loss while Plaintiffs receive the benefit of an unearned windfall.  With that said, it remains undisputed that genuine issues of fact exist relating to RF5.  Plaintiffs may establish that the RF5 pledges were forged and the loans were provided to RF5 without notice to or authorization from M. Larach.  However, this fact cannot preclude summary judgment as it relates to Inlaza.  Plaintiffs fail to present a genuine issue of fact precluding summary judgment on Counts IV and V of the Counterclaim and Counts II – VIII of the Second Amended Complaint as it relates to the Inlaza loan.

For the foregoing reasons, it is hereby recommended as follows:

1.    Defendants' Motion for Summary Judgment on Counts IV and V (as it relates to Inlaza only) of the Counterclaim should be **GRANTED** as it relates to Inlaza.

2.    Defendants' Motion for Partial Summary Judgment on Counts II – VIII of the Second Amended Complaint (as it relates to Inlaza) should be **GRANTED**.  Plaintiffs Second Amended Complaint (as it relates to Inlaza) should be **DISMISSED**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein, if any.  *R.T.C.*

*v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 7th day of June, 2011.

 */s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

38